IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TAMMY W.,

        Plaintiff,

v.                                         Civil Action 2:22-cv-300
                                               Judge Michael H. Watson
                                             Magistrate Judge Jolson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION

Plaintiff Tammy W. brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

I.     BACKGROUND

On April 29, 2019, Plaintiff protectively filed an application for DIB alleging disability beginning April 10, 2017. (Tr. 938–39). After her application was denied both initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a telephonic hearing on October 20, 2020. (Tr. 768–805). The ALJ denied Plaintiff's application in a written decision on March 1, 2021. (Tr. 251–76). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–7).

Next Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 6, 11, 13, 14).

A.     **Relevant Hearing Testimony**

The ALJ summarized Plaintiff's testimony from the administrative hearing:

[Plaintiff] testified that several impairments had left her unable to work since April 10, 2017. [Plaintiff] testified that she was five feet tall and that she weighed two hundred pounds. She said that she took several medications for fibromyalgia related pain, but that she continued to experience significant pain that limited her ability to perform basic activities. She said that she could not bend over due to her pain and that she needed assistance from her daughter to get out of the shower and assistance with other basic daily activities such as cooking and the laundry due to her pain. In addition to her pain, [Plaintiff] testified that she experienced spasms in her back and swelling in her legs when she walked and that she could not stand for more than fifteen minutes at a time. She said that she could sit for thirty minutes at a time before she was forced to change positions and that she could lift a gallon of milk, but could not lift that much weight for more than short periods.

(Tr. 261).

B.     **Relevant Medical Evidence**

The ALJ summarized Plaintiff's medical records and symptoms as follows:

[Plaintiff] underwent a spinal cord stimulator implantation at the Adena Regional Medical Center to address her chronic pain syndrome (Ex. 5F/115-124). No complications were noted in the operative report (Ex. 5F/115-119).

On April 25, 2017, [Plaintiff] followed up with Physician's Assistant Amanda Sheldon at the Adena Regional Medical Center (Ex. 4F/40-42; dup. at 5F/214-216). Ms. Sheldon noted [Plaintiff] had undergone a spinal stimulator implantation recently and had no concerns (Ex. 4F/40-41). [Plaintiff]'s exam showed her incisions were clean and dry and that she was neurovascularly intact in her lower extremities (Ex. 4F/42). Her exam also showed [Plaintiff]'s body mass index (BMI) was 38.92 (Ex. 4F/42). [Plaintiff] returned to the Adena Medical Center for reprogramming of her stimulator in May 2017 and June 2017 (Ex. 4F/33-39).

On June 20, 2017, Dr. Andrew Porter examined [Plaintiff] in connection with her spinal stimulator (Ex. 4F/30-33; dup. at 5F/204-207). Dr. Porter noted [Plaintiff] reported that she had fallen in May 2017 and that at that time she started experiencing pain around the site of stimulator (Ex. 4F/31). Upon exam, Dr. Porter noted [Plaintiff]'s obesity, she was well groomed and that she appeared well (Ex. 4F/31). There were no abnormalities in her abdomen, her cranial nerve exam was normal and she had mild allodynia to light touch and hyperalgesia to deeper palpitation around her implant site (Ex. 4F/31). [Plaintiff]'s exam showed no neurological abnormalities and [Plaintiff] was started on a lidocaine ointment and gabapentin (Ex. 4F/30-32).

[Plaintiff] followed up with Dr. Andrew Porter on July 21, 2017 (Ex. 4F/24-27; dup. at 5F/198-201). [Plaintiff] reported tenderness in her right flank and left sacroiliac joint area (Ex. 4F/26). Her gait was antalgic, she had five out of five strength in both hips and in all areas of her lower extremities bilaterally (Ex. 4F/26). Her sensation was normal in her lower extremities, there was no atrophy present and Dr. Porter noted [Plaintiff]'s psychiatric exam was normal (Ex. 4F/26). [Plaintiff]'s exam was unchanged when she followed up with Dr. Porter in September 2017 and in November 2017 (Ex. 4F/12-18; dup. at 5F/186-192). The record also indicates that [Plaintiff] received sacroiliac joint injections in the latter months of 2017 (Ex. 5F/82-106).

On December 18, 2017, [Plaintiff] followed up with Dr. Marta Gryniuk (Ex. 12F/39-42). [Plaintiff] reported swelling throughout her entire body and pain (Ex. 12F/39). However, Dr. Gryniuk did not note any swelling on exam and [Plaintiff]'s gait was noted as normal (Ex. 12F/41). [Plaintiff]'s exams continued to show no edema in any area and no neurological abnormalities when she followed up with Dr. Gryniuk in 2018 (Ex. 12F/27-38).

On January 3, 2018, Rheumatologist Dr. Kenneth Van Dyke examined [Plaintiff] in connection with her reports of pain in her hands, legs and lower back (Ex. 5F/182-184). [Plaintiff]'s exam showed her BMI was 37.79 and she was alert and oriented in all three spheres (Ex. 5F/183). [Plaintiff]'s heart sounds were normal and she had five out of five strength in all of her extremities (Ex. 5F/183-184). Dr. Van Dyke noted [Plaintiff]'s gait was normal, she had a full range of motion in all areas and diffuse joint and muscle tenderness out of proportion to her exam (Ex. 5F/184). He noted [Plaintiff] had no synovitis in any of her joints and his impression was fibromyalgia (Ex. 5F/182, 184).

[Plaintiff] was diagnosed with diabetes at Adena Medical Center on October 23, 2018 (Ex. 5F/27-58). On October 29, 2018, [Plaintiff] sought treatment for lightheadedness at the Adena Regional Medical Center emergency room (Ex. 5F/9-25). [Plaintiff] reported that she had been diagnosed with diabetes the week before and she was having episodes of dizziness and chest pain (Ex. 5F/10). [Plaintiff]'s exam showed she was not in acute distress, her lungs were clear and she had tenderness in her chest wall (Ex. 5F/12). [Plaintiff]'s heart sounds were normal, her abdominal exam was normal and she had no abnormalities in her musculoskeletal system other than tenderness to palpitation in her back muscles (Ex. 5F/12-13).

[Plaintiff]'s neurological exam showed no focal deficits, she was alert and she was not in apparent distress (Ex. 5F/13). An electrocardiogram showed no abnormalities (Ex. 5F/19). A chest x-ray showed signs of possible bronchitis and [Plaintiff]'s spinal stimulator (Ex. 5F/23). The treatment notes indicate that [Plaintiff] was able to walk without difficulty and she reported improvement in her symptoms with fluids (Ex. 5F/13). [Plaintiff]'s symptoms were described as vague and she was discharged the same day (Ex. 5F/13).

3

On October 30, 2018, Dr. Andrew Porter examined [Plaintiff] (Ex. 4F/5-8; dup. at 5F/172-174). [Plaintiff]'s exam showed her BMI was 37.07 and she had tenderness to palpitation at the site of her implanted stimulator and tenderness in her lumbar area bilaterally (Ex. 4F/6). [Plaintiff]'s straight leg raise testing was positive at forty-five degrees and no other neurological abnormalities were noted in any other area (Ex. 4F/6). [Plaintiff]'s exams were unchanged when she followed up with Dr. Porter in December 2018 and March 2019 but [Plaintiff] continued to report pain in her legs (Ex. 4F/68-76; 5F/156-160, 167-171).

Dr. Marta Gryniuk examined [Plaintiff] on March 22, 2019 (Ex. 6F/7-11). [Plaintiff] reported elevated blood pressure, light-headedness, dizziness and headaches after her hospital admission earlier in the month (Ex. 6F/7; 12F). Dr. Gryniuk noted [Plaintiff]'s exam showed her BMI was 39.91 and that her blood pressure was 133/78 (Ex. 6F/9). [Plaintiff] was alert, she was not in acute distress and Dr. Gryniuk noted [Plaintiff]'s gait was slow and cautious (Ex. 6F/10). Her posture was normal and her heart and lung sounds were normal (Ex. 6F/10). Dr. Gryniuk noted [Plaintiff] was doing well on her blood pressure medications and continued them (Ex. 6F/10). He also recommended [Plaintiff] undergo imaging of her brain in connection with her reports of headaches (Ex. 6F/10-11). A report included in Dr. Gryniuk's records indicates that [Plaintiff]'s impairments caused difficulties with prolonged sitting and standing (Ex. 6F/4-5).

On April 9, 2019, Dr. Daniel Verrill examined [Plaintiff] at the Kettering Brain and Spine Center (Ex. 7F/11-15; dup. at 11F). Dr. Verrill noted [Plaintiff]'s spinal cord stimulator was no longer functioning appropriately because it had lost the ability to hold a charge (Ex. 7F/12). He recommended a pocket revision and battery replacement surgery (Ex. 7F/12). [Plaintiff]'s exam showed her blood pressure was 108/80 and that she was obese (Ex. 7F/14). [Plaintiff]'s bowel sounds were normal, she was able to move all her extremities normally and she reported pain to light touch in her legs (Ex. 7F/14). [Plaintiff] was pleasant and she had four out of five strength in all the muscle groups tested in her lower extremities (Ex. 7F/14-15). Dr. Verrill noted [Plaintiff] had tenderness in her lumbar spine and sacroiliac joints and her straight leg raise testing was negative (Ex. 7F/15). Dr. Verrill also noted [Plaintiff]'s gait and station were normal (Id.).

Dr. Verrill completed the battery replacement and pocket revision surgery on May 16, 2019 (Ex. 7F/4-11; 14F/25-52). No complications were noted in the operative report (Ex. 7F/10-11). On May 28, 2019, Dr. Verrill noted [Plaintiff] reported benefits from the medication gabapentin and that she continued to have some hip pain (Ex. 7F/3). [Plaintiff]'s exam showed no motor strength deficits, no neurological deficits and a normal gait (Ex. 7F/3). [Plaintiff] was not in acute distress and her mental status exam showed no abnormalities (Ex. 7F/3). Dr. Verrill increased her dose of gabapentin and prescribed an antibiotic (Ex. 7F/3).

***

[Plaintiff] followed up with Dr. Marta Gryniuk on August 20, 2019 (Ex. 8F/14-17). The clamant reported pain in her right hip that radiated down her leg (Ex. 8F/14). Dr. Gryniuk noted [Plaintiff]'s exam showed she was not in acute distress and she was obese (Ex. 8F/16). Her gait was normal and she had no edema in her lower extremities (Ex. 8F/16). [Plaintiff]'s exam showed her attention span and ability to concentrate were intact and her mental status was normal despite a reported depressed mood (Ex. 8F/16). Dr. Gryniuk continued [Plaintiff]'s blood pressure medications and her prescription for Cymbalta was refilled (Ex. 8F/17). A statement included with Dr. Gryniuk notes indicated that [Plaintiff]'s pain and fatigue would limit her ability to perform sustained work activity (Ex. 8F/6).

[Plaintiff] followed up at the Kettering Brain and Spine Center on August 22, 2019 (Ex. 9F/5- 10). Nurse Practitioner Lauren Stroud noted [Plaintiff] reported symptoms consistent with bilateral sacroiliitis (Ex. 9F/5-6). [Plaintiff]'s exam showed full strength in both of her hips and throughout her lower extremities (Ex. 9F/6). [Plaintiff] had tenderness in her lumbar region and sacroiliac joints with a limited range of motion in her lumbar spine (Ex. 9F/6). [Plaintiff] had no issues moving any of her limbs, her sensation was intact in all areas and her mental status exam showed no abnormalities (Ex. 9F/6). Nurse Practitioner Stroud also noted her gait was normal, she could perform heel and toe walk testing and she could perform tandem gait testing (Ex. 9F/6). [Plaintiff]'s spinal cord stimulator was reprogrammed and she was advised to follow up in four weeks (Ex. 9F/7).

Nurse Practitioner Kathleen Adkins also examined [Plaintiff] on August 22, 2019 in connection with her diabetes and fibromyalgia (Ex. 13F/1-6; dup. at 22F/32-33). [Plaintiff]'s exam showed her blood pressure was 112/80 and her body mass index (BMI) was 38.42 (Ex. 13F/3). There was no edema or other abnormalities noted in her extremities, her respiratory functioning was normal and her mental status exam showed no abnormalities (Ex. 13F/3). [Plaintiff]'s medication was switched to long acting insulin and her dose of gabapentin was increased (Ex. 13F/4-6). [Plaintiff]'s exam was unchanged when she followed up with Dr. Adkins in September 2019 (Ex. 15F/42; dup. at 22F/7-8).

[Plaintiff] received bilateral greater trochanteric bursa injections and sacroiliac joint injections in September 2019 and October 2019 (Ex. 14F/7-24; dup. at 20F and at 22F). On November 15, 2019, [Plaintiff] followed up with Nurse Practitioner Lauren Stroud (Ex. 20F/21-23; dup. at 22F/16-18). [Plaintiff] reported that her pain left her unable to sit, stand or walk for more than ten minutes at one time and that she could lift fifteen pounds without pain (Ex. 20F/22). [Plaintiff]'s exam showed reduced strength in her hips, but full strength in her lower extremities (Id.). She had tenderness and limited range of motion in her lumbar spine with normal sensation (Ex. 20F/22). Nurse Practitioner Stroud also noted [Plaintiff] was sitting in her exam chair, she did not appear to be in distress and she was pleasant (Ex. 20F/22). Her gait was normal and she could do heel walking, toe walking and tandem gait testing (Ex. 20F/23).

[Plaintiff] established care with Dr. Beatrice Kenol on January 15, 2020 (Ex. 18F/8-15). [Plaintiff] reported pain throughout her body and that her pain was not as well controlled with medication as it had been in the past (Ex. 18F/8-9). Upon exam, Dr. Kenol noted [Plaintiff] was obese, she had mild tenderness in her sacroiliac joints and a normal range of motion in her lumbar spine and all of her extremities (Ex. 18F/13). She had eighteen positive tender points, normal sensation and normal motor strength in all areas (Id.). There was no edema in her extremities and Dr. Kenol noted [Plaintiff]'s exam showed no evidence of inflammatory arthritis or any other systemic connective tissue disease (Ex. 18F/13-14).

[Plaintiff] followed up with Nurse Practitioner Kathleen Adkins in January 2020 (Ex. 15F/28-33). [Plaintiff] reported musculoskeletal pain (Ex. 15F/28). [Plaintiff]'s exam showed she was obese and that she reported pain with range of motion testing of her thoracic spine, lumbar spine and both knees (Ex. 15F/30-31). There was no edema in her extremities and her mental status exam showed no abnormalities (Ex. 15F/31). [Plaintiff]'s medications were refilled (Ex. 15F/31-32). [Plaintiff]'s exams showed no abnormalities in her musculoskeletal system or any other area other than her obesity when she followed up with Nurse Practitioner Adkins in February 2020 (Ex. 15F/15, 22). [Plaintiff] received additional telehealth services through Nurse Practitioner Adkins in 2020 for various complaints (Ex. 21F).

On March 3, 2020, [Plaintiff] sought treatment for reports of acute abdominal pain (Ex. 17F). Imaging of her abdomen showed no evidence of a bowel obstruction or perforation and no evidence of diverticulitis (Ex. 17F/38). [Plaintiff]'s exam showed she was obese, there were no abnormalities in any of her extremities or her abdominal exam (Ex. 17F/7-9). Her motor strength and sensation were normal and the exam of her back showed no abnormalities (Ex. 17F/9). Her mental status exam was also normal (Ex. 17F/9). [Plaintiff] was treated for a urinary tract infection and discharged (Ex. 17F/44-46).

An x-ray of [Plaintiff]'s lumbar spine was completed on March 3, 2020 (Ex. 20F/10-11; dup. at 22F/9). The imaging showed [Plaintiff]'s spinal stimulator and no other abnormalities or any significant disc disease (Ex. 20F/11). Dr. Daniel Verrill noted [Plaintiff]'s diffuse pain complaints did not have a clear etiology and she was referred to physiatry to optimize her body mechanics (Ex. 20F/17).

[Plaintiff] followed up with Dr. Kenneth Van Dyke on June 11, 2020 (Ex. 19F/1-3). [Plaintiff] reported pain and swelling in her hands and feet, but Dr. Van Dyke noted her exam showed no visible swelling in any of [Plaintiff]'s joints (Ex. 19F/2). He also noted [Plaintiff] appeared comfortable and not in distress with a normal range of motion (Ex. 19F/2). Her exam was unchanged when she followed up with Dr. Van Dyke in July 2020, but she reported tenderness in multiple tender points (Ex. 19F/5). [Plaintiff]'s gait was normal and she had a full range of motion in all areas (Id.).

>Nurse Practitioner Kathleen Adkins examined [Plaintiff] on September 23, 2020 (Ex. 26F/1-7). [Plaintiff] also reported that she needed disability paperwork completed (Ex. 26F/1). [Plaintiff] reported a headache and fibromyalgia related pain that limited her ability to perform basic activities (Ex. 26F/1). [Plaintiff]'s exam showed she reported pain with range of motion testing in multiple areas and she had no edema in any area (Ex. 26F/4). Her mental status exam showed no abnormalities (Ex. 26F/4). Nurse Practitioner Adkins indicated that [Plaintiff] could not sit, stand or walk for more than fifteen minutes each due to her pain (Ex. 26F/5). Nurse Practitioner Adkins noted she completed her statement with assistance from [Plaintiff] regarding her abilities and review of rheumatology consultation notes (Ex. 26F/5).
>
>Nurse Practitioner Kathleen Adkins also completed a medical statement on September 23, 2020 (Ex. 23F). She indicated that she first saw [Plaintiff] in August 2019 (Ex. 23F/3). She noted [Plaintiff] had pain symptoms and over ten tender points (Ex. 23F/2). In her opinion, [Plaintiff] could sit, stand or walk for less than two hours each in an eight-hour day and she would require fifteen-minute unscheduled breaks during the workday (Ex. 23F/3). She opined that [Plaintiff] would be off task for twenty five percent of the work period and that she would miss more than four days of work per month (Ex. 23F/3). In her treatment notes from September 23, 2020, Nurse Practitioner Adkins noted she completed her statement with assistance from [Plaintiff] regarding her abilities and review of rheumatology consultation notes (Ex. 26F/5).

(Tr. 261–66).

  C. **The ALJ's Decision**

The ALJ found that Plaintiff meets the insured status requirement through June 30, 2023, and has engaged in substantial gainful employment after her alleged onset date during the following period: January 2018 to March 2018. (Tr. 256). But there has been a continuous 12-month period(s) during which Plaintiff did not engage in substantial gainful activity. The ALJ determined that Plaintiff has the following severe impairments: obesity, chronic pain syndrome, bilateral sacroiliitis, fibromyalgia, hypertension and type two diabetes. (Tr. 257). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (Tr. 260).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except [Plaintiff] can never climb ladders, ropes or scaffolds and occasionally climb ramps and stairs. [Plaintiff] is limited to work that allows her to alternate/change positions every thirty minutes for one to two minutes while remaining at the workstation and no change in the work process. [Plaintiff] can frequently balance, stoop and occasionally kneel, crouch or crawl. [Plaintiff] must avoid unprotected heights; she must avoid moving mechanical parts and she cannot perform commercial driving. [Plaintiff] can work at a consistent pace throughout the workday but cannot perform production rate pace work where tasks must be performed quickly such as an assembly line.

(*Id*.).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 261).

Relying on the vocational expert's testimony, the ALJ determined that Plaintiff was unable to perform her past relevant work as production assembler, laundry worker II, warehouse worker, daycare giver, and school bus monitor, but she could perform other jobs that exist in significant numbers in the national economy such as an addresser, document preparer, or press clipping cutter and paster. (Tr. 268–69). She therefore concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, at any time since April 10, 2017. (Tr. 270).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also

be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff alleges the ALJ erred in her evaluation of Nurse Practitioner Adkins' ("NP Adkins") medical source statement. (Doc. 11 at 8–14). The Commissioner counters that the ALJ reasonably considered and evaluated the opinion from Ms. Adkins when formulating the residual functional capacity, which she found was not consistent with the evidence of record, including examination findings showing she was in no distress and had no abnormalities in gait, motor strength, range of motion, or neurological functioning. (*See generally*, Doc. 13). Upon review, the Undersigned finds the ALJ properly evaluated the medical opinion, and substantial evidence supports the RFC.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 155 (6th Cir. 2009). *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining Plaintiff's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and Plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). The RFC assessment must be based on all the relevant evidence in Plaintiff's case file. 20 C.F.R. § 416.945(a)(1). "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'" *Davis v. Commissioner of Soc. Sec.*, No. 2:19-CV-265, 2019 WL 5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Plaintiff filed her application after May 23, 2017, so it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017). Taken together, the regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).

Regarding two of these categories (medical opinions and prior administrative findings), an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight,

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

10

to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(1); 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(2); 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. §§ 404.1520c(b)(2); 416.920c(b)(2).

At bottom, the role of the ALJ is to articulate how persuasive he or she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021). And the Court's role is different. Notably, the Court must not reweigh the evidence, but instead make sure the ALJ employed the proper legal standard by considering the factors and supported the conclusion with substantial evidence. *Id.*, at *14.

11

Here, the ALJ determined that Plaintiff had "the residual functional capacity to perform sedentary work" with additional limitations: "[Plaintiff] can never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs. [She] is limited to work that allows her to alternate/change positions every thirty minutes for one to two minutes while remaining at the workstation and no change in the work process. [Plaintiff] can frequently balance, stoop and occasionally kneel, crouch or crawl. [She] must avoid unprotected heights; she must avoid moving mechanical parts and she cannot perform commercial driving. [Plaintiff] can work at a consistent pace throughout the workday but cannot perform production rate pace work where tasks must be performed quickly such as an assembly line." (*Id.*). In coming to this determination, the ALJ considered Plaintiff's medical and non-medical evidence, including Plaintiff's treatment history, medical opinions from her providers, her subjective complaints, and her daily activities. (Tr. 260–268).

Plaintiff challenges the ALJ's evaluation of just one medical opinion, that of NP Adkins. NP Adkins opined that Plaintiff could sit, stand, or walk for less than two hours in an eight-hour day. (Tr. 2058). She said Plaintiff would sometimes need to take unscheduled breaks of fifteen minutes throughout the workday and that she would be off-task at least twenty-five percent of the time. (Tr. 2059). In her opinion, she estimates that Plaintiff would miss more than four days of work per month. (*Id.*).

The ALJ found NP Adkins's opinion to be unpersuasive because it is "not well supported and inconsistent with the medical evidence." (Tr. 266). She went on to explain her determination:

> [Nurse Practitioner] Adkins provided very little narrative explanation in support of her opinions and while she indicated that she reviewed rheumatology notes prior to issuing her opinions, she also reported that she relied on [Plaintiff]'s subjective statements regarding her functional abilities in assessing [Plaintiff]'s functioning. In addition, her own treatment notes do not support her opinion that [Plaintiff] could not stand, sit or walk for more than fifteen minutes. While Nurse Practitioner Adkins noted [Plaintiff]'s symptoms significantly limited her ability to stand, sit or walk, her own exams of [Plaintiff] consistently showed [Plaintiff] was not in acute

> distress, she had no abnormalities in her extremities and no neurological abnormalities (Ex. 13F2, 15F15, 22, 31, 42). Nurse Practitioner Adkins' opinions are also not consistent with the other medical evidence. The medical record does indicate that [Plaintiff] reported pain on a consistent basis. However, the exams in the record consistently showed that she did not appear to be in distress during appointments despite her reports of debilitating pain. In addition, while [Plaintiff] had tenderness and a limited range of motion during some exams, the vast majority of exams in the record showed no abnormalities in [Plaintiff]'s gait, motor strength, range of motion or neurological functioning. Therefore, the [ALJ] finds the opinions provided by Nurse Practitioner Adkins are not persuasive.

(*Id*.).

The ALJ thus provided several reasons for discounting the opinion. First, she determined that NP Adkins's opinion was unsupported. This is because NP Adkins provided little narrative explanation, her treatment notes do not support her restrictive findings, and she relied on Plaintiff's subjective statements. NP Adkins's opinion is in a checklist form, so the ALJ's contention that there is little narrative explanation of her restrictive opinion is correct. (Tr. 2058–59). More still, when evaluating NP Adkins's treatment notes, the ALJ found the notes to be unsupportive of the restrictive opinion. In the treatment notes from the day NP Adkins gave her opinion, she said Plaintiff had moderate to mild pain with motion and no edema. (Tr. 2077). In previous treatment notes, NP Adkins noted that Plaintiff's physical exams were normal (Tr. 1694, 1784, 1791). Thus, the ALJ's reasoning has support. The ALJ also raised concerns because NP Adkins relied, at least in part, on Plaintiff's subjective statements regarding her functional abilities. (Tr. 266, 2078). The regulations make clear that supportability requires consideration of objective medical evidence like laboratory findings, not Plaintiff's statements. 20 C.F.R. § 404.1520c; 20 C.F.R. § 404.1502(f–g).

In sum, the ALJ looked at NP Adkins's opinion and found it unsupported due to her lack of narrative explanation, lack of support from her own treatment notes, and reliance upon Plaintiff's subjective statements. (Tr. 266). The ALJ clearly considered the opinion's supportability and sufficiently explained her decision to enable review by the Undersigned. Thus, ALJ satisfied the

13

regulations. *See* 20 C.F.R. § 404.1520c(b)(2). And, notably, Plaintiff does not appear to challenge supportability. (*See generally* Doc. 11).

Next, the ALJ found that NP Adkins's restrictive opinion was inconsistent with the record. (Tr. 266, 2058). The ALJ noted that while the "medical record does indicate that [Plaintiff] reported pain on a consistent basis[,]" the record also shows that Plaintiff was not in distress during appointments, which is inconsistent with her debilitating reports of pain. (Tr. 266). And, though at times Plaintiff had tenderness and a limited range of motion, "the vast majority of exams in the record showed no abnormalities in [Plaintiff]'s gait, motor strength, range of motion or neurological functioning." (*Id.*). Based upon this analysis, the ALJ concluded that NP Adkins's opinion that Plaintiff could only sit, stand, or walk for less than two hours in an eight-hour day, would need fifteen-minute breaks throughout the day, would be off-task for twenty-five percent of the time, and would miss four days of work per month, was inconsistent with the record. (Tr. 266).

Plaintiff challenges the ALJ's evaluation of consistency. She characterizes the ALJ's review as "very narrow and cursory." (Doc. 11 at 10). Plaintiff argues the ALJ should have considered her history of ongoing and widespread pain; her difficulty walking or standing; tenderness; medication prescribed to treat her pain; and symptoms such as fatigue, poor sleep, irritable bowel syndrome, brain fog, myalgias, headaches, dizziness, depression, and muscle spasms. (Doc. 11 at 11–12 (citing Tr. 1309, 1392–93, 1398, 1405, 1412, 1524–25, 1570, 1913, 1931–32)). At base, Plaintiff is arguing that NP Adkins's opinion is consistent with the record.

The ALJ expressly explained her consistency determination when analyzing NP Adkins's opinion, and her discussion of the record elsewhere is also considered because the ALJ's opinion ought to be read as a whole. See *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that the ALJ's entire decision must be considered); *Crum v. Comm'r of Soc. Sec.*, 660 F.

App'x 449, 457 (6th Cir. 2016) (affirming ALJ evaluation of opinion where "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records" undercutting the opinion); *Carpenter v. Comm'r of Soc. Sec.*, No. 2:18-CV-1250, 2019 WL 3315155, at *10 (S.D. Ohio July 24, 2019), *report and recommendation adopted*, No. 2:18-CV-1250, 2019 WL 3753823 (S.D. Ohio Aug. 8, 2019) (considering the ALJ's discussion of Plaintiff's depressive disorder at step two when determining if the RFC is supported).

Here, the ALJ extensively considered Plaintiff's medical record in determining her RFC, including many of the symptoms, limitations, and records Plaintiff cites. The ALJ considered records documenting Plaintiff's pain, tenderness, dizziness, occasional limitations in lumbar spine range of motion, and difficulty with prolonged sitting or standing. (Tr. 262–64 (citing Tr. 1103, 1165–1173, 1123, 1234–50 1381–85, 1392–96, 1524–25, 1534, 1545–46, 1588, 1902–09)). But the ALJ also noted that Plaintiff had normal strength, a normal gait, no swelling or edema, a full range of motion, normal bowel movements, and the ability to walk without difficulty; she was repeatedly reported as not being in acute distress despite her claims of pain; and she was fully alert, had an intact attention span, and had a normal mental status. (Tr. 262–265 (citing Tr. 1123, 1234–50, 1407–09, 1534–35, 1545–46, 1570–72, 1588, 1660–71, 1674, 1854, 1937–38, 1911, 1914)). The ALJ also considered that her rheumatologists said her tenderness was out of proportion to her examination results (Tr. 1407–09), and that there was no evidence of inflammatory arthritis or other systemic tissue disease (Tr. 1908). Plaintiff says the ALJ should have considered her pain, difficulty walking or standing, tenderness, medication prescribed to treat her pain, fatigue, poor sleep, irritable bowel syndrome, brain fog, myalgias, headaches, dizziness, depression, and muscle spasms. (Doc. 11 at 11–12 (citing Tr. 1309, 1392–93, 1398, 1405, 1412, 1524–25, 1570, 1913,

15

1931–32)). But it is clear from this review that the ALJ considered nearly every symptom and limitation Plaintiff cites.

And the ALJ did more. Beyond the medical record, the ALJ considered other medical opinions. She found Dr. Gryniuk's opinion to be vague and overly restrictive, thus not persuasive. (Tr. 267). But she found Drs. Torrell's and Hinzman's opinion to be too permissive. They opined that Plaintiff could do light work, but the ALJ said the opinion did not adequately account for Plaintiff's reports of pain after the evaluation was done. So she found it to be only partially persuasive. (Tr. 267).

Finally, the ALJ considered Plaintiff's testimony and her daily activities. She looked at Plaintiff's reports of significant pain, spasms in her back, swelling in her legs, that she could not stand for more than fifteen minutes at a time, and that she could only sit for thirty minutes at a time before she needed to change positions. (Tr. 261). The ALJ also considered Plaintiff's function report, which indicated she spent time doing chores without help. (Tr. 268 (citing Tr. 989)). She also noted that Plaintiff was able to work for several months during a time when Plaintiff reported she was disabled by pain, suggesting her impairment is not as limiting as alleged. (Tr. 268).

In sum, the ALJ determined NP Adkins's restrictive opinion was inconsistent with the medical record. The ALJ's extensive evaluation of Plaintiff's medical record (Tr. 260–268), allowed the Undersigned to follow the ALJ's logic in coming to her conclusion that NP Adkins's restrictive opinion is inconsistent with the record. Plaintiff's allegations to the contrary are baseless. The ALJ discussed much of the evidence Plaintiff cites, and, importantly, the ALJ does not have to discuss every piece of evidence. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Thus, the ALJ properly considered consistency when determining that NP Adkins's opinion was unpersuasive.

16

In sum, the ALJ properly considered medical and non-medical evidence, including NP Adkins's medical opinion. The ALJ's analysis of this opinion allowed the Court to conduct a review of the decision because she built a logical bridge between the evidence and her conclusion. Fundamentally, Plaintiff disagrees with how the ALJ weighed the evidence. But the ALJ is charged with resolving conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). But the law prohibits the Court from reweighing the evidence and substituting its judgment for the ALJ's. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").

## IV.   CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## V.   PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

17

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: August 24, 2022                    /s/ Kimberly A. Jolson
                                                                                                   KIMBERLY A. JOLSON
                                                                                                   UNITED STATES MAGISTRATE JUDGE